QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

Susheel Kirpalani
James Tecce
51 Madison Avenue, 22nd Floor,
New York, New York 10010-1601
(212) 849-7000

Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

*Special Counsel to the Official Committee of
Unsecured Creditors of Lehman Brothers
Holdings, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., <u>et al</u>.<br><br><div align=center>Debtors.</div> | Chapter 11<br><br>Case No. 08-13555 (JMP) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., <u>et al</u>.<br><br><div align=center>Plaintiff,</div><br><div align=center>-against-</div><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>and<br><br>LEHMAN BROTHERS INC.,<br><br>and | Adversary Proceeding<br><br>No.: 09-_____ (JMP)<br><br>COMPLAINT FOR DECLARATORY RELIEF PURSUANT TO 11 U.S.C. § 105(a) AND 28 U.S.C. §§ 2201, 2202 AND AN ACCOUNTING |

LB 745 LLC,

and

BARCLAYS CAPITAL INC.,

                Defendants.

## COMPLAINT FOR DECLARATORY RELIEF PURSUANT TO
## 11 U.S.C. § 105(a) AND 28 U.S.C. §§ 2201, 2202
## AND FOR AN ACCOUNTING

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Unsecured Creditors of Lehman Brothers Holdings

Inc. ("LBHI") and its affiliated debtors and debtors-in-possession (the "Committee"), by and

through its undersigned counsel, hereby brings this Complaint for declaratory relief pursuant to

section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code") and 28 U.S.C. §§

2201 and 2202 against LBHI, Lehman Brothers, Inc ("LBI"), LB 745 LLC ("LB 745")

(collectively "Lehman" or the "Sellers") and Barclays Capital Inc. ("Barclays" or the

"Purchaser"), and alleges as follows:

### PRELIMINARY STATEMENT

        1.      Through this action, the Committee seeks a declaration that certain post-petition

transfers of billions of dollars in securities and other assets from Lehman to Barclays were not

authorized by the Bankruptcy Court in its September 19, 2008 order (the "Sale Order")

authorizing and approving the sale of the majority of the assets of the North American broker

dealer-business of LBI to Barclays (the "Sale Transaction") or any other order of the Bankruptcy

Court. Specifically, the Committee seeks a declaration that a self-styled "clarification letter"

dated September 20, 2008, but executed on September 22, 2008 (the "Clarification Letter"),

which was used as the vehicle for Barclays' attempt to transfer billions of dollars in assets in connection with the Sale Transaction, was never presented to, reviewed by, or approved by the Bankruptcy Court. Although it was stated at the September 19, 2008 hearing seeking entry of the Sale Order (the "Sale Hearing") that the parties were "hoping to finalize and actually present [the Clarification Letter] to Your Honor whenever it comes down here," this never occurred. In fact, the Court was never asked to approve the final, executed version of the Clarification Letter, which was filed with the Court on September 22, 2008 (after the Court entered the Sale Order) on the date that the Sale Transaction closed.

2.     The misleadingly titled Clarification Letter is anything but a "clarification" to the Sale Transaction approved by this Court.   As an initial matter, the Clarification Letter significantly altered the structure of the Sale Transaction from an asset sale to a trade that accomplished the "sale" of estate assets through, inter alia, a termination of a repurchase agreement previously entered into between the parties. Indeed, when the repurchase agreement was terminated, section 559 of the Bankruptcy Code demanded that the excess collateral value constituted property of the estate.

3.     More importantly, the Clarification Letter did not entail just a change to the mechanics of the sale. By setting forth certain "buckets" of securities, the Clarification Letter crystallized Barclays' receipt of a secret, undisclosed, $5 billion block discount in the value of the purchased assets. In addition to locking in this discount, the Clarification Letter provided the means to acquiesce to Barclays' harried, post-hearing demands for additional assets by purporting to transfer certain additional assets that were not part of the original asset purchase agreement, were not disclosed to the Court, and were not specifically approved under the Sale Order.

4. In particular, Barclays claims the Clarification Letter entitles Barclays to receive (i) repurchase agreement collateral valued far in excess of the liabilities assumed (possibly by as much as $7.19 billion), (ii) certain additional assets valued at no less than $1.9 billion and held in "clearance boxes" belonging to LBI that were listed on Schedule B to the Clarification Letter, (iii) certain 15-c3-3 securities valued at between $750 million and $800 million, and (iv) an undisclosed amount of collateral supporting Lehman's OCC accounts, valued at $2.3 billion. Thus, Barclays' demand for additional assets provided at least an incremental $5 billion (and possibly more than $10 billion) of value for which no additional consideration was provided to Lehman and their estates. Consequently, significant and real harm has been inflicted on the creditors of the Lehman estates for which the Committee seeks appropriate redress.

5. Accordingly, through this action, the Committee seeks a declaration that the Clarification Letter and the transactions consummated thereunder were never approved by the Court. It also seeks an accounting from Barclays with respect to the assets transferred and liabilities assumed in connection with the Sale Transaction.

## PARTIES

6. The Committee was appointed pursuant to section 1102 the Bankruptcy Code and is a party in interest in these chapter 11 cases under section 1109(a) of the Bankruptcy Code.

7. LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020. The Committee has named LBHI as a formal party solely because it signed the Clarification Letter. Upon information and belief, LBHI does not oppose the relief requested herein, i.e., a declaration that the Court did not approve the Clarification Letter.

8.     LBI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address is James W. Giddens as Trustee for SIPA Liquidation of Lehman Brothers Inc., c/o Hughes Hubbard & Reed, LLP, One Battery Park Plaza, New York, NY 10004 (Attn: James B. Kobak, Jr.), attorneys for the SIPA Trustee. The Committee has named LBI as a formal party solely because it signed the Clarification Letter.  Upon information and belief, LBI does not oppose the relief requested herein, i.e., a declaration that the Court did not approve the Clarification Letter.

9.     LB 745 LLC is a Delaware limited liability corporation with its former principal place of business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.  The Committee has named LB 745 LLC as a formal party solely because it signed the Clarification Letter.  Upon information and belief, LB 745 LLC does not oppose the relief requested herein, i.e., a declaration that the Court did not approve the Clarification Letter.

10.     Upon information and belief, Barclays is a corporation organized under the laws of the United Kingdom with its principal place of business in London, England.  It maintains offices in Manhattan at 200 Park Avenue, New York, NY 10166 and 745 Seventh Avenue, New York, NY 10019.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory predicates for the relief requested herein are sections 105(a) of the Bankruptcy Code and 28 U.S.C. §§ 2201 and 2202.

14.     The Court has the authority to issue a declaration of rights and grant future

necessary or proper relief pursuant to 28 U.S.C. §§ 2201, 2202.

## BACKGROUND

**A.     The Bankruptcy Court Approved the Sale of LBI's Assets to Barclays Based on the Specific Representations Regarding the Nature and Value of the Assets to be Transferred from Lehman to Barclays Contained in APA and Stated During the Sale Hearing**

15.     Lehman together with their debtor and non-debtor affiliates (collectively,

"Lehman Brothers") were formerly the fourth largest investment bank in the United States.  For

more than 150 years, Lehman Brothers was a leader in the global financial markets by serving

the financial needs of corporations, governmental units, institutional clients and individuals

worldwide. Lehman Brother's headquarters in New York and regional headquarters in London

and Tokyo were complemented by a network of offices in North America, Europe, the Middle

East, Latin America and the Asia Pacific region.

16.     Commencing on September 15, 2008, and continuing from time to time thereafter,

LBHI and certain of its direct and indirect subsidiaries (the "Debtors") voluntarily commenced

cases under chapter 11 of the Bankruptcy Code with this Court.  On September 19, 2008, a

proceeding under the Security Investors Proceeding Act ("SIPA") was commenced for LBI.

James W. Giddens is acting as the trustee in the SIPA proceeding.

17.     On September 16, 2008, the Sellers and the Purchaser executed an asset purchase

agreement (including its court reviewed and approved amendments, the "Asset Purchase

Agreement" or "APA") for the sale of the majority of the assets of the North American broker

dealer business of LBI to Barclays.   The APA set forth the cash and securities that would be

transferred to Barclays as part of the Sale Transaction.  In addition to certain real estate

transferred as part of the Sale Transaction, the APA generally provided for Barclays to pay $250

million cash plus up to $750 million in potential payments under a "true up" provision, receive

assets with a book value of $70 billion, and assume $69 billion in liabilities.

18.      Specifically, the original APA defined Purchased Assets to include:

(a) the Retained Cash; (b) all deposits . . . ; (c) the Transferred Real Property
Leases . . . ; (d) government securities, commercial paper, corporate debt,
corporate equity, exchange traded derivatives and collateralized short-term
agreements with a book value as of the date hereof of approximately $70 billion .
. . (e) 50% of each position in the residential real estate mortgage securities.[1]

19.      In addition, the APA further provided for the assumption of liabilities "with a

book value as of the date hereof of approximately $69 billion."[2]

20.      On September 17 and 19, 2008, the Court held hearings to consider whether to

approve the Sale Transaction identified in the APA.

21.      At the September 17, 2008 bid procedures hearing, the Debtors outlined the terms

of the transaction to the Bankruptcy Court, explaining that, pursuant to the terms of the APA, a

copy of which had been submitted to the Court, Lehman had agreed to transfer approximately

$70 billion of securities to Barclays in exchange for Barclays's assumption of $69 billion of

Lehman's liabilities.  Taking into account all the exchanged consideration, it was explained to the

Court that "looking at it from the net of this transaction, there will be approximately

1,700,000,000 dollars yielded out of this transaction" for Barclays.

22.      Just two days later at the September 19, 2008 Sale Hearing, the Debtors informed

the Court that the value of the assets to be exchanged between Lehman and Barclays had

changed.  According to the Debtors, the value of the assets to be transferred to Barclays had

---

[1]   APA § 1.1 (definition of "Purchased Assets") (emphasis added).

[2]   Ex. 1, APA § 2.3(i).

dropped to "$47.4 billion," and that Barclays would be assuming "$45.5 billion" in Lehman's liabilities.

23. Specifically, the Debtors stated the following with respect to the changes to the transaction:

> "Let me try to summarize the changes that were made to the transaction. In terms of the economic changes, they result largely because of the markets, unfortunately. And from the time that the transaction was actually entered into till now, the markets dropped and the value of the securities dropped as well. ***So, originally, we were selling assets that had a value of seventy – approximately seventy billion dollars. And today . . . we're only selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets*** (emphasis added)."

24. The Debtors also explained that—other than those changes detailed in an amendment to the APA,[3] which had been submitted to the Court—the other consideration to be exchanged between Lehman and Barclays had not changed. Specifically, the Debtors stated that "Barclays is still agreeing to pay the cure amounts on any leases that it assumes or that we assume and assign to it. Barclays is also agreeing to the same employee compensation arrangements. And it is also agreeing to pay the 250 million dollars of goodwill to LBI."

25. In addition, at the Sale Hearing, the Court was informed that Lehman and Barclays intended to execute a Clarification Letter that would supplement the APA and clarify which Lehman subsidiaries would be transferred to Barclays as part of the transaction. Specifically, the document would "clarify that the only subsidiaries that are being purchased by Barclays are Lehman Brothers Canada Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA."

---

[3] The First Amendment changed the APA's definition of "Purchased Assets" to provide that all of LBI's residential real estate securities would be transferred to Barclays as security for clearing services provided by the Depository Trust Clearance Corporation ("DTCC"). Under the APA, Lehman was going to retain 50% of such securities.

26. The Debtors provided the Court with no further description of the document, but promised that once the letter was finalized it would be "present[ed] to Your Honor."

27. The Clarification Letter, however, was not finalized until after the Sale Hearing, and was never presented to the Bankruptcy Court—and certainly not at the time the Court issued the Sale Order on September 19, 2008. Although the Clarification Letter is dated September 20, 2008, upon information and belief, it was not finalized or executed until two days later on September 22, 2008, the date of the closing of the Sale Transaction.

28. Notwithstanding this, based on the representations made at the Sale Hearing by the Debtors regarding the contents of the Clarification Letter, on September 19, 2008, the Court approved the sale of LBI's North American operations to Barclays as purportedly described in the APA and the Clarification Letter, the latter of which at that time had neither been finalized nor executed. Thus, the Sale Order defined "Purchase Agreement" to include the Clarification Letter.

29. Simply put, the Court never saw the Clarification Letter and never reviewed its terms at any time prior to the entry of the Sale Order.

30. At the Sale Hearing, the Committee made clear that it did not affirmatively support the sale because it had not had sufficient opportunity to evaluate the terms of the Sale Transaction. Specifically, the Committee stated on the record that: "We're not affirmatively supporting the transaction, Your Honor, because there has been insufficient time for us to really do all the due diligence that we would feel should be done to take that next step of saying yes, this is the best deal and we're supportive actively."

31. The Court entered the Sale Order in the early morning hours of September 20, 2008. During the weekend following the Sale Hearing, the parties expended considerable efforts to finalize the Sale Transaction with the goal of closing the Sale Transaction before the markets opened on the following Monday (September 22, 2008).

**B. The Terms of the Executed Clarification Letter Do Not Comport with the Description of the Letter at the September 19, 2008 Hearing; Lehman Transfers Billions in Assets to Barclays that are Not Disclosed to the Court**

32. The transaction effected through the Clarification Letter executed on September 22, 2008 bears little resemblance to the transaction described to the Court at the Sale Hearing. To be sure, the Clarification Letter identified the Lehman entities to be transferred to Barclays. It also, without the Bankruptcy Court's knowledge or approval, fundamentally rewrote the terms of the transaction and redefined and expanded the scope and value of the assets to be transferred from Lehman to Barclays as part of the deal.

33. The Clarification Letter made *four* significant material (but undisclosed) changes to the Sale Transaction:

34. *First*, it eliminated the original core of the sale transaction: the transfer of "$47.4 billion" in Lehman-owned assets to Barclays in exchange for the assumption by Barclays of "$45.5 billion" in Lehman's liabilities relating to the assets.

35. Instead, pursuant to the terms of the Clarification Letter, Barclays would retain securities and other assets pledged by LBI to Barclays in connection with a repurchase agreement executed on September 18, 2008 (the "Barclays Repurchase Agreement") pursuant to which Barclays provided LBI with $45 billion in short-term financing. In exchange for the retained securities, LBI's obligations under the Barclays Repurchase Agreement would be deemed satisfied.

36. A repurchase agreement (or "Repo") is a common financing arrangement whereby one party sells assets to another for a set price with the agreement that the second party will buy back those assets in a short time frame for that price plus a margin.

37. During the early part of the week of September 15, 2008, the Federal Reserve Bank of New York (the "Fed") had entered into a Repo contract (the "Fed Repurchase Agreement") with LBI to provide short-term financing of $45 billion to LBI to help keep LBI's brokerage business afloat.

38. As is generally the case with Repo contracts, LBI was required to post collateral in excess of the $45 billion financing provided by the Fed. This additional collateral is generally known as a "haircut."

39. In light of the pending sale of the majority of LBI's North American assets to Barclays, the Fed demanded that Barclays "step into the Fed's shoes" and provide the $45 billion Repo financing to LBI pending court consideration of the sale to Barclays. Thus, on September 18, 2008, Barclays and LBI entered into the Barclays Repurchase Agreement and the financing arrangement thereunder replaced the financing previously provided by the Fed.

40. Pursuant to Barclays's assumption of the Fed's role as the provider of the $45 billion Repo financing to LBI, LBI agreed to transfer the collateral that it had pledged to the Fed under the Fed Repurchase Agreement to Barclays. Consequently, on or about September 18, 2008, a majority of those assets were transferred from the Fed's collateral agent, JPMorgan Chase N.A. ("JPMorgan"), to Barclays's collateral agent, the Bank of New York Mellon ("BONY").

41.     Not less than the full value of the collateral posted by LBI pursuant to the Fed Repurchase Agreement was ultimately transferred to Barclays. The value of the haircut under the Barclays Repurchase Agreement is believed to be between approximately $4.7 billion and $7.19 billion.

42.     Although the existence of the Repo financing by Barclays was identified to the Bankruptcy Court at the Sale Hearing, the Court was not provided with any indication that any Lehman assets (including the haircut) would be permanently transferred to Barclays in connection with the Repo financing arrangement or that the Barclays Repurchase Agreement would be the vehicle for consummating the Sale Transaction and transferring Lehman assets to Barclays.

43.     Significantly, because the new transaction set out in the Clarification Letter did not involve the sale of Lehman's assets, but the execution on collateral pledged by LBI in connection with the Barclays Repurchase Agreement, pursuant to section 559 of the Bankruptcy Code, all of the excess value of the collateral not used to satisfy the debt owed to Barclays pursuant to the Barclays Repurchase Agreement—totaling between approximately $4.7 billion and $7.19 billion—is property of the Lehman estates.

44.     Section 559 provides that *"*[i]n the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, ***any excess of the market prices received on liquidation of such assets . . . over the sum of the stated repurchase prices . . . shall be deemed property of the estate*** . . . .*"* (emphasis added).

45.     ***Second***, in addition to the change in the structure of the Sale Transaction and the

transfer to Barclays of the implied discount or haircut under the Barclays Repurchase

Agreement, the Clarification Letter expanded the scope of the assets to be transferred to Barclays

to include assets held in "clearance boxes" belonging to LBI that were listed on a Schedule B that

was attached to the Clarification Letter.  At the time of the execution of the Clarification Letter,

these assets were not providing security for any debt owed by Lehman to any creditor.  Thus,

they could be freely (and secretly) transferred from Lehman to Barclays without protest from any

secured creditor.

46.     The value of these assets is estimated to be between $1.9 and $2.3 billion.

47.     ***Third***, the Clarification Letter expanded the scope of the assets to be transferred

to Barclays to include, to the extent permitted by law, certain excess reserves, including certain

"15-c3-3 assets," to Barclays.

48.     Under Rule 15-c3-3, promulgated by the SEC pursuant to the Securities Exchange

Act of 1934, brokerages are required to keep on-hand assets sufficient to cover a specified

percentage of their customer portfolio, much like a depository requirement for banks.  Because

of the unwinding of some customer positions in and around September 2008, LBI had excess

reserves totaling approximately $1 billion.

49.     ***Fourth***, Barclays claims the Clarification Letter expanded the scope of the assets

to be transferred to Barclays to include certain property supporting exchanged-traded derivatives

from Lehman to Barclays.  This included assets held in certain Lehman accounts at the Options

Clearing Corporation (the "OCC Assets").

50.     Barclays was transferred least $2.3 billion of OCC Assets pursuant to the Clarification Letter.  Ultimately, billion of dollars in OCC Assets were transferred to Barclays.

51.     In total, pursuant to the terms of the Clarification Letter, Barclays was transferred several billion dollars in assets without consideration by or approval from the Bankruptcy Court.

52.     As a direct effect of the above-described change to the terms and structure of the Sale Transaction between the Lehman Sellers and Barclays, as obliquely outlined in the Clarification Letter, the net profit to Barclays (and net loss to the estate) for the transaction was several billion dollars more than it would have been pursuant to the terms of the APA as described to the Bankruptcy Court at the Sale Hearing and ultimately approved by the Bankruptcy Court in the Sale Order.

53.     Until recently, and only through Court-ordered discovery, the Committee was not aware of the above-described material modifications to the terms of the APA through the Clarification Letter, or of the extra-judicial transfer of assets from Lehman to Barclays.

**C.      The Terms of the Executed Clarification Letter and the Transfer of Additional Assets from Lehman to Barclays Were Never Approved by the Bankruptcy Court and are Prohibited by the Bankruptcy Code**

54.     The key terms of the Clarification Letter described above were inserted into the letter or finalized after Sale Order was signed and issued in the early hours of September 20, 2008.

55.     Because the Bankruptcy Court was not aware of and never approved the material changes to the APA effectuated by the terms of the Clarification Letter as described above, any post-petition transfer of assets from Lehman to Barclays made pursuant to the Clarification Letter were not authorized by the Sale Order or any other order of the Bankruptcy Court, and are recoverable by the Lehman estates under §549 of the Bankruptcy Code.

56.     Moreover, to the extent the changes to the Clarification Letter can be considered to be non-material changes to the Sale Transaction (and the Committee does not consider such changes non-material), they still are void pursuant to the terms of the Sale Order.

57.     As the Sale Order makes clear, any amendments to the APA or "related agreements" that would "have a material adverse effect on the Debtors' estates" could not be made without Court approval.  Non-material changes could only be made with the written approval of "the Committee, the Debtors and the Purchaser" -- which the Committee did not provide.  The Sale Order also provides that "this Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order."

58.     Accordingly, the Committee seeks a declaration that the Court never approved the Clarification Letter and the transaction consummated thereunder.  Based on this, the Committee submits that billions of dollars in securities and other assets transferred post-petition from Lehman to Barclays were not authorized by the Sale Order or any other order of the Bankruptcy Court.

## Count I
### (Declaratory Judgment as to Clarification Letter
### pursuant to 28 U.S.C. §§ 2201, 2202)

59.     The Committee repeats and realleges all the allegations contained in this Complaint.

60.     On September 19, 2008, based on representations made by the Debtors as to the terms of the APA and the Clarification Letter at the Sale Hearing, the Bankruptcy Court approved the sale of the majority of the assets of the North American operations of LBI to Barclays as outlined in the APA.

15

61.     Pursuant to the terms of the Sale Order, any amendments to the APA or "related agreements" that would "have a material adverse effect on the Debtors' estates" could not be made without Court approval.  Non-material changes could only be made with the written approval of "the Committee, the Debtors and the Purchaser" -- which the Committee did not provide.  Moreover, to the extent of any inconsistency between the Sale Order and the Purchase Agreement (defined to include the Clarification Letter), then the Sale Order governs.

62.     Because the Clarification Letter had not been finalized or executed at the time the Sale Order was issued, and was never presented to the Court for its review and consideration, the Court could not have—and did not—approve or authorize the terms of the Clarification Letter through the Sale Order or any other order of the Bankruptcy Court.

63.     Accordingly, all terms of the Clarification Letter—including Section 1(a)(ii), Section 8, and Section 13, which purportedly authorized 1) the retention by Barclays of as much as $7.19 billion of excess collateral posted by LBI to Barclays under the Barclays Repurchase Agreement, 2) the transfer to Barclays of assets held in "clearance boxes" belonging to Lehman, 3) the transfer from Lehman to Barclays of the 15-c3-3 assets, and 4) the transfer from Lehman to Barclays of the property supporting the OCC Assets—were not approved by the September 19, 2008 Sale Order or any other order of the Bankruptcy Court.

64.     Pursuant to the terms of the Clarification Letter, billions in assets were transferred to Barclays, which transfers were not disclosed to the Bankruptcy Court.  These transfers were not authorized by the Sale Orders or any other order of the Bankruptcy Court and hence are recoverable by the Lehman estates.

65. Because Barclays disagrees as to whether the Clarification Letter was approved by the Court, there is an actual controversy between the parties. Upon information and belief, the Lehman Sellers do not dispute the Clarification Letter was not approved by the Bankruptcy Court.

66. Accordingly, the Committee seeks a declaration that all terms of the Clarification Letter that were not disclosed to the Court at the Sale Hearing, including Section 1(a)(ii), Section 8, and Section 13, were not approved by the Bankruptcy Court pursuant to the Sale Order or any other order of the Bankruptcy Court.

67. The Committee further seeks a declaration that any and all post-petition transfers of assets from Lehman to Barclays (or retention of Lehman assets by Barclays) pursuant to the Clarification Letter were not authorized by the Sale Order or any other order of the Bankruptcy Court and thus are prohibited by the Bankruptcy Code.

## Count II
### (Accounting)

68. The Committee repeats and realleges all the allegations contained in this Complaint.

69. The Sale Transaction was a complex transaction involving the transfer of billions in assets and the assumption of billions in liabilities.

70. The Committee has demanded from Barclays a final transaction reconciliation of the assets acquired and liabilities assumed by Barclays in connection with the consummated Sale Transaction. The Committee has never received such a reconciliation.

71. Accordingly, the Committee the demands that Barclays provide an accounting identifying specifically the assets transferred to Barclays from the Lehman Sellers, and the liabilities assumed by Barclays from the Lehman Sellers (including their final amounts).

## Count III
## (Attorneys' Fees, 28 U.S.C. § 2202)

72.     The Committee repeats and realleges all the allegations contained in this

Complaint.

73.     Section 2202 of the Declaratory Judgment Act provides that the Court may grant

"further necessary and proper relief based on a declaratory judgment . . . against any adverse party

whose rights have been determined by such judgment."  28 U.S.C. § 2202.

74.     As a result of the positions taken by Barclays, the Committee was forced to obtain

additional services from the undersigned attorneys to protect the rights of all parties in interest to

the Debtors' chapter 11 cases.  The Committee therefore seeks a judgment against Barclays for all

the Committee's reasonable and necessary attorneys' fees incurred in recovering the assets

secreted from the estate by Barclays.

75.     The Committee's attorneys' fees are recoverable from Barclays if the Committee

 prevails on its request for a declaratory judgment.

**PRAYER FOR RELIEF**

WHEREFORE, the Committee respectfully seeks an Order from this Court:

- declaring that the Court did not approve the Clarification Letter and the transactions consummated thereunder pursuant to the Sale Order or any other order of the Bankruptcy Court;

- awarding attorneys fees from Barclays;

- directing Barclays to provide an accounting of the assets transferred and liabilities assumed by Barclays in connection with the Sale Transaction; and

- awarding any and all other relief the Court deems appropriate.

DATED:  New York, New York
November 16, 2009

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By:  /s/ James C. Tecce
    Susheel Kirpalani
    James Tecce

51 Madison Avenue, 22nd Floor,
New York, New York 10010-1601
(212) 849-7000

Erica Taggart

865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

*Special Counsel for the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc., et al.*